IN THE COMMONWEALTH COURT OF PENNSYLVANIA

R&L Carriers, : 
              Petitioner : 
  : No. 1164 C.D. 2019
          v. : 
  : Submitted: February 21, 2020
Workers' Compensation  Appeal : 
Board (Timothy Grace, East Coast : 
Driver Solutions, QBE Insurance : 
Company and Uninsured Employers : 
Guaranty Fund), : 
              Respondents : 

BEFORE:   HONORABLE P. KEVIN BROBSON, Judge
                 HONORABLE PATRICIA A. McCULLOUGH, Judge
                 HONORABLE ELLEN CEISLER, Judge

***OPINION NOT REPORTED***

MEMORANDUM OPINION
BY JUDGE McCULLOUGH                     FILED:  June 12, 2020

       R&L Carriers (R&L) petitions for review from the July 24, 2019 order of the Workers' Compensation Appeal Board (Board), which affirmed in part and reversed in part the decision of a workers' compensation judge (WCJ) granting the claim petition filed by Timothy Grace (Claimant) against R&L, and denying the claim petitions filed by Claimant against East Coast Driver Solutions (East Coast), QBE Insurance Company (QBE), and the Uninsured Employers Guaranty Fund (UEGF) pursuant to the Workers' Compensation Act (Act).[1]  We affirm.

---

[1] Act of June 2, 1915, P.L. 736, *as amended*, 77 P.S. §§1-1041.4, 2501-2710.

**Facts and Procedural History**

On March 17, 2017, Claimant filed a workers' compensation (WC) claim petition and penalty petition naming East Coast as his employer and alleging that he was injured at work on September 20, 2016, and that the Act had been violated because his medical bills were unpaid. That same day, Claimant also filed a claim petition alleging that R&L was his employer. Further, on April 10, 2017, Claimant filed a notice of claim against uninsured employer, alleging that East Coast was uninsured, and on May 2, 2017, filed a claim petition for benefits from the uninsured employer, *i.e.*, East Coast, as well as the UEGF. Subsequently, on May 9, 2017, the UEGF filed a joinder petition, joining R&L as an additional employer. On November 30, 2017, a WCJ issued an interlocutory "410 Order," which directed R&L and East Coast/QBE to each pay 50 percent of Claimant's medical expenses and total disability benefits beginning September 20, 2016.

On January 8, 2018, Claimant filed a penalty petition naming R&L, and a day later filed another penalty petition naming East Coast. On February 2, 2018, R&L submitted a notice of temporary compensation payable, and on February 15, 2018, submitted a notice of conversion of the temporary compensation into compensation payable.

As part of the claim petition and penalty petition proceedings, the UEGF introduced the June 28, 2017 deposition of Claimant.[2] Claimant stated that he was involved in a work injury on September 20, 2016, when he was driving a tractor trailer truck. Claimant affirmed that before starting to work for East Coast, he filled out a paper application that he obtained from East Coast at its office. Later, East Coast called Claimant to tell him he was hired and to inform him about the company to which he would be assigned. In particular, Claimant explained that Meghan

---

[2] Only those facts that are relevant to R&L's appeal are discussed herein.

2

Marcalongo at East Coast hired him and told him that he would be assigned to a trucking company, R&L, and would operate according to R&L's work preferences. Claimant stated that East Coast texted him on his phone every Friday to tell him where he was expected to work the next week and that he stopped at East Coast every Friday to pick up his paycheck. Claimant testified that if he needed to take sick time or vacation time he would contact East Coast. He stated that East Coast assigned him to any contracts it had at the time, but that he could not recall driving for a company other than R&L after being hired by East Coast. Claimant indicated that he had to provide East Coast with a valid commercial driver's license (CDL) and that East Coast's safety director, Skyler Sloan, conducted safety training, which included asking him different questions and requiring him to undergo a random drug test. He stated that if he had a human resources problem on the job he would notify Mr. Sloan. (Findings of Fact (F.F.) No. 35a-b, d-f.)

With respect to the injury, Claimant stated that he was injured during a home delivery for R&L in Trevose, Pennsylvania, on September 20, 2016. Claimant explained that a hand-jack he was using to lift a pallet broke, which caused the pallet to shift and hit him in the arms. Claimant testified he was in a lot of pain and reported the injury to R&L the same day it occurred. R&L told him that East Coast would take care of it, so Claimant then reported his injury to Mr. Sloan. Thereafter, Claimant received a letter from East Coast stating that he would continue to receive pay in the amount of $871.00 per week until he was cleared to return to work. However, Claimant had not received a paycheck since March 2016. Claimant also stated that during the time he worked for East Coast he was only assigned to the R&L contract. (F.F. No. 35g-l.)

Claimant testified that he considered R&L to be his employer on September 20, 2016, and that East Coast merely told him who he would be working for on that particular day. Claimant stated that R&L instructed him to conduct "pre-

3

and post-trip [inspections] of the [R&L] equipment at all times and [that] all the equipment he operated was owned by R&L." (F.F. No. 35b.) The trucks and trailers that he drove all said R&L on them; however, he never wore an R&L uniform. When Claimant delivered equipment to customers, the bills indicated they were from R&L. Claimant also explained that he used R&L's dispatch and that his driver's log was an R&L log book. Claimant stated that when he worked for R&L, R&L's dispatcher provided Claimant his delivery paperwork, told him what type of truck to drive, and would "run the bill through the scanner in the truck so [R&L] would know where" he was located. (F.F. No. 35c.) Claimant stated that the conversations regarding deliveries always took place at R&L's facility in New Jersey, that Claimant did not have "any say in the assignments," *id.*, and that he would go to R&L's facility every day. Claimant testified that R&L would tell him if it was unsatisfied with his performance and could refuse to allow him to continue to work at its facility. (F.F. No. 35r, t-w.)

Claimant stated that after he was injured he took his medical bills to East Coast, which told him it "would take care of them," and if he needed prescriptions "he was supplied cash by East Coast for the prescriptions." (F.F. No. 35f.) Claimant explained that he had a conversation with East Coast's operations manager, Jerry Walker, who told him that "the bills were taken care of." *Id.* Claimant indicated that he had 20 years of experience as a truck driver and had to recertify his license every 4 years. Claimant also stated that East Coast "did not provide him any training, health insurance, pension, retirement benefit or social security benefits," that he was paid by the hour, and that he did not receive "sick time or sick leave" from East Coast. Claimant only visited East Coast on Fridays in order to pick up his paycheck. Claimant characterized East Coast as a company that provided truck drivers to other companies, but that did not conduct any of its own deliveries. Claimant indicated that when he filled out his application with East Coast, the application did not reference

4

R&L, and if East Coast had informed him that another company required his services he would have been required to work for that company. Claimant also stated that he never received a paycheck from R&L. (F.F. No. 35v, x-y, aa-ff.)

Claimant also testified at a WCJ hearing that took place on November 29, 2017. Claimant again confirmed that on September 20, 2016, he was working as a truck driver for R&L, to whom he had been assigned by East Coast. He explained that every morning he reported to R&L's dispatcher for his assignment, that he completed a pre-trip inspection of the equipment before each trip, and that if there was a problem with the equipment he would write up a vehicle report and notify R&L's mechanics. He testified that at the end of each week he informed an R&L employee, named Matt, that he was done for the week, and that Matt would tell Claimant he was needed for the following week. Claimant also stated that an East Coast employee would text him every Friday night to tell him to report to R&L the next week. He testified that if he had any problems during the week, including having to miss work due to being sick, he contacted R&L. Claimant explained that "each day he would go to [R&L] [to] pick up the truck, drive the route, and then drop the truck off at R&L." (F.F. No. 35bb.) Claimant stated that "he would not go to East Coast for anything but to pick up his paycheck." *Id.* Claimant testified that East Coast continued to pay his wages from September 20, 2016, through March 3, 2017. (F.F. No. 35hh-jj, ll, oo.)

The UEGF also introduced the Driver Service Agreement (Agreement), dated September 26, 2013, between East Coast and R&L. The Agreement stated that East Coast desired to perform services for R&L "by furnishing drivers, who shall be employees" of East Coast, to operate motor vehicles owned or leased by R&L and used in R&L's business. (F.F. No. 35kk.) The Agreement also stated that East Coast would be responsible for the WC claims of drivers and that R&L would be responsible for automobile and all other liabilities caused by the acts or omissions of

5

drivers conducting R&L's business. East Coast also represented in the Agreement that it would maintain WC coverage for drivers assigned to R&L and that East Coast would indemnify, hold harmless, and defend R&L to the extent of any losses incurred by R&L as a result of East Coast's failure to satisfy its WC responsibilities. Yet, with respect to "Customer Control and Supervision," the Agreement stated that drivers on assignments would be "borrowed servants" of R&L and would be "under the sole control and supervision" of R&L. (F.F. No. 36a-c; Reproduced Record (R.R.) at 278a-79a.)

The WCJ credited Claimant's testimony that he was hired by East Coast, received his wages from East Coast, and reported problems to East Coast. However, the WCJ gave this testimony limited weight and placed greater weight on Claimant's testimony that he reported to R&L on a daily basis, received his work assignments from R&L's dispatchers regarding when and where to travel for deliveries, used R&L's trucks and trailers, contacted R&L's dispatchers if he had work problems, and R&L could refuse to permit Claimant to continue working if it was unsatisfied with Claimant's performance. Accordingly, the WCJ found that Claimant's testimony established that Claimant worked under the direction and control of R&L. The WCJ also found that Claimant's testimony was supported by the Agreement and, particularly, its provision that drivers on assignments were considered borrowed servants of R&L and were under the sole control and supervision of R&L. Thus, the WCJ found that "Claimant's credible testimony establishe[d] . . . [that] Claimant was a borrowed servant under the direction of [R&L] who [was] [Claimant's] statutory employer." (F.F. No. 40.)

The WCJ also found that Claimant was injured on September 20, 2016, while in the course and scope of employment and while employed by R&L. The WCJ found that the nature of Claimant's injury was a "bilateral bicep tendon tear with a right arthroscopic repair," which rendered Claimant temporarily totally

6

disabled from September 21, 2016, onward. (F.F. No. 45.) Additionally, the WCJ found that QBE was not responsible for payment of WC benefits for the September 20, 2016 injury. (F.F. Nos. 45, 47, 49.)

Because he determined that Claimant was a borrowed servant under the direction and control of R&L, the WCJ concluded that R&L was liable for payment of compensation at the weekly rate of $871.00 beginning September 21, 2016, ongoing, and liable for the payment of medical treatment provided for the September 20, 2016 injury. (WCJ's Conclusions of Law (C.L.) Nos. 3-5.)[3] However, since he determined that the UEGF was not at risk for the injury and that East Coast was not the employer liable for WC benefits, the WCJ dismissed those parties. (C.L. Nos. 13-14.) Finally, the WCJ required R&L to reimburse East Coast and QBE for any compensation and medical expenses paid by those parties to date. (C.L. No. 15.)

R&L appealed the decision and order of the WCJ to the Board, arguing that the WCJ erred in finding R&L liable on the basis that Claimant was a borrowed employee and that East Coast admitted liability because it made payments to Claimant in lieu of compensation. Based on its review of the evidence, the Board determined that the WCJ did not err in concluding that R&L was liable for the payment of WC benefits because Claimant was R&L's borrowed employee. (Board decision at 8.) Although R&L argued that the WCJ had overlooked evidence that East Coast initially paid Claimant's medical expenses and wages and that the Agreement stated that drivers were employees of East Coast and that East Coast would maintain WC coverage for drivers assigned to R&L, the Board found that

---

[3] The WCJ also concluded that R&L had violated the Act due to its unreasonable and excessive delay of payment of compensation and, consequently, assessed a 50% penalty against R&L for all compensation delayed during the period from March 4, 2017, through February 2, 2018, payable directly to Claimant, plus statutory interest. In addition, the WCJ required R&L to pay a 20% quantum meruit attorney fee, concluding that R&L did not have a reasonable basis for its delay in complying with the 410 Order. (C.L. Nos. 8, 16-17.)

7

R&L disregarded the most important factor of all, *i.e.*, "the right to control the performance of the work." *Id.* Examining Claimant's testimony, which was deemed credible by the WCJ, as well as the relevant provisions of the Agreement, the Board concluded that "[b]ecause the Agreement says that [R&L] would have the right of control over its borrowed employees['] work and manner of performance, and the evidence show[ed] that [R&L] did actually have control, . . . the WCJ's analysis [was] legally correct." *Id.* at 10.

The Board also concluded that, although East Coast paid Claimant's medical expenses and wages from the time of injury on September 20, 2016, until March 3, 2017, *Claimant* had not asserted a claim of estoppel against East Coast on either his own behalf or on behalf of R&L. *Id.* at 11. The Board further determined that East Coast's action of paying wages did not mean that Claimant could not be the borrowed employee of R&L.[4] Rather than focusing on payment of wages, the Board held that the WCJ focused on the issue of control, which weighed against R&L. *Id.* Accordingly, the Board affirmed the WCJ's order and decision to the extent that the WCJ concluded that Claimant was R&L's borrowed employee and that R&L was liable for the payment of Claimant's WC benefits.[5]

---

[4] The Board also noted that, after initially making payments to Claimant, East Coast went out of business. In addition, although the Board observed that R&L, as a matter of civil law, may have a contractual right of contribution and/or indemnification from East Coast under the Agreement, the Court declines to address the merits of this issue or otherwise comment upon the viability of such a claim.

[5] R&L also argued on appeal to the Board that the WCJ erred in granting Claimant's penalty petition and in requiring R&L to pay quantum meruit attorney fees. The Board agreed, concluding that R&L had not violated the Act and that R&L's contest of the penalty petition was reasonable. (Board decision at 12, 14.) Thus, the Board reversed the WCJ's order to the extent it granted Claimant's penalty petition and assessed quantum meruit attorney fees against R&L. *Id.* at 14.

8

## Discussion

R&L now petitions for review of the Board's order,[6] arguing that the Board erred in (1) failing to conclude that East Coast accepted liability for Claimant's work injury, and (2) concluding that R&L is Claimant's borrowed employer.

### A. Whether East Coast Accepted Liability for Claimant's WC Benefits

We first address whether the Board erred in failing to recognize that East Coast accepted liability for Claimant's injury. R&L argues that the Board disregarded substantial evidence that East Coast admitted liability for Claimant's WC claim and that East Coast was responsible for Claimant's WC benefits. R&L contends that East Coast sent Claimant a letter after the injury admitting liability for Claimant's WC claim, and then made payments in lieu of compensation from October 2016 until February 2017, in the weekly amount of $861.00. R&L also observes that East Coast never issued a document denying the claim. Relying solely on *Kelly v. Workmen's Compensation Appeal Board (DePalma Roofing)*, 669 A.2d 1023 (Pa. Cmwlth. 1995), R&L argues that when an employer makes payments to an employee "in lieu of workers' compensation, and fails to file a [n]otice of [c]ompensation [d]enial, then the employer is estopped from denying compensability for the claim and the employer's action is deemed an admission of liability, as if the employer had filed a [n]otice of [c]ompensation [p]ayable." (R&L's Br. at 16) (emphasis omitted).

---

[6] Our scope of review is limited to determining whether findings of fact are supported by substantial evidence, whether an error of law has been committed, or whether constitutional rights have been violated. Section 704 of the Administrative Agency Law, 2 Pa.C.S. §704; *Meadow Lakes Apartments v. Workers' Compensation Appeal Board (Spencer)*, 894 A.2d 214, 216 n.3 (Pa. Cmwlth. 2006).

9

In contrast, QBE argues that, although East Coast sent Claimant for treatment and paid his wages for a period, *Claimant* did not assert a claim of estoppel against East Coast on his *own behalf* or *on behalf of R&L*. QBE also argues that *Kelly* is distinguishable because that case did not address the issue of whether an entity that makes payments is the responsible employer, when another entity has been adjudicated to be the legal borrowing employer that was in control of the performance of the claimant's work at the time of injury. QBE further maintains that East Coast's conduct in paying wages did not mean that Claimant could not be the borrowed employee of R&L. It argues that because R&L controlled the manner and performance of Claimant's work, East Coast's payment of wages did not release R&L of liability for Claimant's injury.[7] Similarly, the UEGF contends that East Coast's payment of wages and medical bills after the injury does not preclude the Board from concluding that R&L was Claimant's borrowing employer. The UEGF also asserts that an outcome where R&L would escape liability due to East Coast's payments is unreasonable, contrary to the humanitarian purposes of the Act, and against public policy.

In *Kelly*, after the claimant was assaulted at work, the claimant's employer paid the claimant's mortgage for six months and paid the claimant's wife $300.00 per week for an unspecified period of time. 669 A.2d at 1024-25. After the claimant filed two claim petitions, the employer challenged the petitions on the ground that the claimant's injury did not occur in the course of his employment. *Id.* at 1025. The WCJ concluded that the employer was estopped from disavowing the "compensability of the claim" because the cash payments made to the claimant and

---

[7] QBE further maintains that R&L itself admitted liability for the September 20, 2016 injury because it issued a notice of temporary compensation payable for the injury.

10

his wife were wages in lieu of WC benefits, but that the employer's contest of the claim was reasonable. *Id.*

On appeal, this Court noted that "[p]ayments in lieu of compensation are any voluntary or informal compensation, apart from the Act, paid with the *intent to compensate for a work-related injury*." *Id.* at 1026 (emphasis added). We also observed that "[i]t is the *intent* of the payment, not the receipt thereof, which is relevant." *Id.* (emphasis in original). We concluded that the WCJ's (then referee)[8] determination that the payments were intended to compensate for the work-injury was amply supported by the evidence in the record. We also determined that "by publicly expressing [its] belief that a co-employee was responsible for [the claimant's] injuries and promptly beginning the weekly cash payments in lieu of [WC] benefits, [the employer] effectively admitted liability under the Act, making any subsequent challenge to that liability unreasonable." *Id.* Thus, we held the employer was estopped from "disavowing the compensability" of the claimant's claim, because, by making cash payments, the employer had admitted liability. *Id.* at 1026-27.

*Holmes v. Workmen's Compensation Appeal Board (Schneider Power Corporation)*, 542 A.2d 197 (Pa. Cmwlth. 1988), which preceded *Kelly* by several years, provides further elucidation regarding the effect of payments made in lieu of compensation by an employer to a claimant. There, following the claimant's injury, the employer made payments to the claimant, representing 60% of the claimant's wages. On appeal, we framed the issue as whether the payments "constitute[d] an admission of *work-related disability*." *Holmes*, 542 A.2d at 199 (emphasis added). We concluded that because the employer had made payments to the claimant

---

[8] A WCJ was formerly known as a referee. *See Clark v. Workmen's Compensation Appeal Board (Keystone Lawn Spray),* 672 A.2d 348, 349 n.1 (Pa. Cmwlth. 1995).

pursuant to a short-term disability program, the employer had made "no admission that the [claimant] suffered a *work-related disability*," and that the burden was still on the claimant to prove that "he had suffered a work-related disability." *Id.* at 199-200 (emphasis added); *see also Ward v. Workers' Compensation Appeal Board (Snap-On, Inc.)* (Pa. Cmwlth., No. 1384 C.D. 2009, filed February 3, 2010) (unreported), slip op. at 9-10, 12 (holding that an employer that pays an employee a percentage of his salary, pursuant to a short-term disability program, does not "make an admission that the employee suffered a work-related disability," and that a claimant seeking to establish that payments "serve as an admission of . . . acceptance of a work-related injury" and that such payments are payment in lieu of compensation must demonstrate that the employer *intended* for the payments to compensate the claimant for a loss of earning power due to a work-related injury).[9]

While R&L argues that we should apply *Kelly* to the instant case, that case is distinguishable for a number of reasons. First, as *Holmes* and *Ward* clarified, where an employer makes payments to a claimant that are intended in lieu of compensation, a claimant may later invoke an estoppel defense against the employer to preclude the employer from denying the *existence* of a *work-related* disability. However, here, neither East Coast nor R&L deny, or have attempted to deny, that Claimant suffered a work-related disability. Second, while *Kelly* and related cases permit *claimants* to estop employers from denying that a work injury occurred where employers have made payments in lieu of compensation, these cases do not stand for the proposition of an employer avoiding liability for WC coverage based on another

---

[9] Pursuant to this Court's Internal Operating Procedures, an unreported opinion of the Court filed after January 15, 2008, may be cited for its persuasive value. 210 Pa. Code §69.414(a).

entity making payments to the claimant or invoking estoppel against a separate entity.[10]

Further, *Sunset Golf Course v. Workmen's Compensation Appeal Board (Department of Public Welfare)*, 595 A.2d 213 (Pa. Cmwlth. 1991), is more analogous to the present set of facts than *Kelly*. In *Sunset Golf Course*, the claimant worked for the Department of Public Welfare (DPW), but was assigned to work as a laborer for Sunset Golf Course (Sunset). 595 A.2d at 214. After the claimant was injured in the course of his employment, the claimant and DPW entered into a compensation agreement, whereby DPW's insurer agreed to pay the claimant total disability benefits. When the claimant later filed a claim petition, DPW filed a petition to review the compensation agreement and a petition to join Sunset, arguing that Sunset was the actual employer at the time of the claimant's injury. After the Board held that Sunset was the claimant's actual employer, Sunset appealed arguing that the Board erred in permitting DPW to assert that it was not the claimant's employer after it accepted liability more than a year earlier. Sunset argued that DPW was precluded from denying that it was the responsible employer at the time of the claimant's injuries and, in support of its argument, relied on several cases in which our Supreme Court held that an employer could not relitigate the issue of whether the cause of a claimant's injury was work-related after the employer had already commenced the payment of WC benefits. *Id.* at 215.

We noted that unlike the cases relied upon by Sunset, which dealt "exclusively with relitigation of the question of whether an injury [was] work-

---

[10] We also note that although East Coast sent Claimant a letter stating that he would "receive a weekly payment in the amount of $861.00 per week until such time that he [was] cleared to return to work from the injury that occurred on September 20th 2016," (R.R. at 277a), there is otherwise no additional evidence in the record regarding East Coast's intention in make these payments or whether it made such payments "with the intent to compensate for a work-related injury." *Kelly*, 669 A.2d at 1026.

13

related[,] [i]n the case before us, there [was] no dispute that the original injuries suffered by [the claimant] [were] work-related." *Id.* at 216. Hence, we determined that the "unresolved question [was] which entity, DPW or Sunset, was the claimant's employer." *Id.* We held that in spite of the earlier compensation agreement between the claimant and DPW, the referee had the authority to substitute Sunset for DPW as the responsible employer. *Id.*

Similarly, here, there is no dispute that Claimant's injury was work-related, and the WCJ found that R&L was Claimant's employer, even though East Coast had initially made wage payments to Claimant following his injury. We conclude that pursuant to *Sunset Golf Course*, the WCJ had the authority to conclude that R&L was the employer responsible for paying Claimant's WC benefits, despite East Coast's earlier payments to Claimant, and that *Kelly* and its related cases do not require a contrary result.

### B. Whether R&L was Claimant's Borrowing Employer

We next turn to whether the Board erred in concluding that R&L was Claimant's borrowing employer. In support of its argument that it was not Claimant's borrowing employer, R&L points to the language in the Agreement whereby the parties agreed that East Coast would be responsible for the WC claims of its employees, maintain WC coverage for drivers assigned to R&L, and remit all federal and state withholdings for its employees. Based on this language, R&L argues that the Board misapplied the legal test for borrowed employees established by this Court in *Red Line Express Co. v. Workmen's Compensation Appeal Board (Price)*, 588 A.2d 90 (Pa. Cmwlth. 1991). R&L also faults the Board for evaluating and applying the Supreme Court's decision in, *JFC Temps, Inc. v. Workmen's Compensation Appeal Board (Lindsay)*, 680 A.2d 862 (Pa. 1996), instead of our decision in *Red Line Express Co.*

14

R&L contends that "the only action R&L took with regard to [] Claimant was to tell him where to pick up a load and where to deliver it." (R&L's Br. at 21.) Additionally, R&L maintains that the WCJ and Board ignored significant evidence in reaching its conclusion, including the fact that Claimant filled out a job application with East Coast; Claimant was hired at East Coast's Bensalem office; Claimant had to present a valid CDL to East Coast in order to complete the hiring process; Claimant underwent drug screening and safety training with East Coast; Claimant received his paychecks from East Coast; Claimant understood that East Coast could assign him to drive for another trucking company; and that Claimant reported his injury to East Coast. Finally, according to R&L, because East Coast had the right to hire, fire, and send Claimant to another location; East Coast paid Claimant and was responsible for his WC benefits; and East Coast had knowledge of the trucking industry, R&L was not Claimant's borrowing employer merely because it designated the work that Claimant needed to complete.

Conversely, QBE maintains that, based on key facts showing that East Coast relinquished control over Claimant and that R&L had the power to control the performance of Claimant's work, the Board properly affirmed the WCJ's determination that Claimant was the borrowed employee of R&L. QBE asserts that Claimant drove exclusively for R&L; that R&L provided Claimant with training, equipment, and daily assignments, which had to be performed in accordance with R&L's operating standards; and that R&L dispatchers told Claimant when and where to go for assignments. QBE also contends that the Agreement further establishes that R&L controlled Claimant's work. QBE argues that R&L is merely seeking to have this Court reweigh the evidence in R&L's favor.

QBE also argues that pursuant to our Supreme Court's decision in *JFC Temps, Inc.*, the right to control is the determinative factor for deciding whether an entity is a borrowing employer. Likewise, QBE contends that *Red Line Express Co.*

15

does not compel a different result and is distinguishable from the instant case. QBE maintains that because R&L determined how its routes were fulfilled and had sole control over Claimant's day-to-day responsibilities, the WCJ and Board correctly found that R&L was Claimant's borrowing employer. The UEGF makes similar arguments for why we should affirm the Board's order.

"The question of whether an employer-employee relationship exists is one of law, based upon the facts of each case." *Red Line Express Co.*, 588 A.2d at 93. In situations where "an employee is furnished by one entity to another, the situation is one of 'borrowed' employee." *Id.* As our Supreme Court held in *JFC Temps, Inc.*, the test for determining whether an employee "furnished by one person to another becomes the employee of the person to whom he is loaned is whether he passes under the latter's right of control with regard not only to the work to be done but also to the manner of performing it." 680 A.2d at 864. Therefore, "the entity possessing the right to control the manner of the performance of the servant's work is the employer, irrespective of whether the control is actually exercised." *Id.* Moreover, "[o]ther factors which may be relevant include the right to select and discharge the employee and the skill or expertise required for the performance of the work. The payment of wages may be considered, but is not a determinative factor." *Id.* (citation omitted). While "the examination of these factors guides the determination, each case must be decided on its own facts." *Id.* Although a provision in an agreement providing that the lending entity will pay for WC insurance is an "important factor" that militates against finding that the borrowing entity is a "borrowing employer" for purposes of the Act, *Red Line Express Co.*, 588 A.2d at 96, "the right to control the performance of the work is the overriding factor," *JFC Temps, Inc.*, 680 A.2d at 865.

With respect to the trucking industry, the presence of the logo of the borrowing entity on the truck driven by the employee is "a factor to consider, and

16

should be given considerable weight," but is not necessarily decisive. *Red Line Express Co.*, 588 A.2d at 95; *see also Lego v. Workmen's Compensation Appeal Board*, 445 A.2d 1324, 1327 (Pa. Cmwlth. 1982). However, the presence of the lessee's logo on the truck raises a rebuttable presumption that the driver is an employee of that party. *Red Line Express Co.*, 588 A.2d at 95; *Shreiner Trucking Company v. Workmen's Compensation Appeal Board (Wagner)*, 509 A.2d 1337, 1340 (Pa. Cmwlth. 1986).

Because both *JFC Temps, Inc.* and *Red Line Express Co.* involved the borrowed employee doctrine in the context of truck driver employees, we will examine the facts of each case. In *JFC Temps, Inc.*, the claimant applied for a position with JFC Temps, Inc. (JFC). After reviewing the claimant's qualifications, JFC assigned the claimant to G&B Packing (G&B) as a tractor trailer driver. G&B had no control over which driver was assigned to it. The claimant reported daily to G&B, where its operation manager informed the claimant of work hours, what truck to use, and where to go, and provided the claimant with freight documents, the bill of lading, and the keys to a tractor trailer. G&B did not specify a particular route for the claimant to take. After hauling a load, the claimant reported back to G&B. No representative of JFC was ever present at G&B's facility. Although JFC determined and paid the claimant's salary, the claimant's time slips were completed and signed by G&B personnel. The claimant called JFC if he was late, ill, or had any questions, and JFC provided G&B with a replacement if the claimant was unable to work. G&B decided if the claimant's work was satisfactory and could request a replacement for the claimant, but could not fire him. Further, the claimant drove a G&B truck. *JFC Temps, Inc.*, 680 A.2d at 863-64.

Ultimately, our Supreme Court concluded that G&B was the borrowing employer. While the Court recognized that JFC selected the claimant for the position at G&B, JFC had the sole power to actually terminate the claimant's employment,

17

and the claimant called JFC if he was sick or had questions, it held that G&B was the borrowing employer because it had the right to control the performance of the claimant's work. *Id.* at 865. In particular, the Court observed that once the claimant arrived at his temporary assignment with G&B, JFC "did not instruct him regarding the performance of his work . . . [and] had no substantial contact with [him] other than processing his paycheck." *Id.* at 866. The Court also noted that G&B controlled the day-to-day operations of the vehicles, and that G&B had the right to select the routes taken by the claimant, even if it did not exercise that right. Because the Court determined that G&B had the right to control the manner of performance of the claimant's work, it upheld the Board's determination that G&B was responsible for the payment of WC benefits. *Id.*

In *Red Line Express Co.*, the claimant initially contacted Princeton Management, Inc. (Princeton), which hired her and told her to report for work with Red Line Express Co. (Red Line). The claimant was assigned to drive a truck that was owned by Princeton but leased to Red Line. 588 A.2d at 92. Pursuant to the lease between Princeton and Red Line, Princeton held title to the trucks leased to Red Line; Princeton leased the trucks to Princeton for Princeton's exclusive possession, control, and complete responsibility; Princeton furnished a competent driver to operate the trucks; and Princeton represented that the driver was familiar with all applicable laws and would cooperate with Red Line in achieving compliance with said laws. *Id.* at 94. Moreover, the lease provided that Princeton was required to pay for all repairs, fuel, and taxes for its trucks and pay the wages and remuneration for its drivers, including WC insurance. Finally, the lease provided that the employees or agents of one party would not be considered employees or agents of the other party. *Id.*

Red Line told the claimant where to pick up loads and where to deliver them. The claimant was also instructed to call Red Line upon completion of delivery

18

to tell it that the load had been delivered. Additionally, the truck that the claimant drove had a Red Line insignia on it. *Id.* at 95.

However, the claimant periodically called Princeton to provide updates. Princeton also told the claimant what route to take on one of her four deliveries. Conversely, Red Line never told the claimant what routes to take, what hours to work, nor whether she was hired for a specific period of time. The claimant could also refuse a Red Line load, and could have hauled loads for other companies if instructed by Princeton. *Id.*

This Court concluded that the evidence established that the claimant remained an employee of Princeton. While we noted the presence of the Red Line insignia on the truck driven by the claimant, we discounted this evidence given that the insignia specifically stated "*leased* to Red Line." *Id.* (emphasis in original). Therefore, we concluded that the language on the insignia, as well as other evidence in the record, rebutted the presumption that the claimant was Red Line's employee because she drove a truck with Red Line's insignia. We also found it important, but not dispositive, that Princeton had contracted to pay for the claimant's WC insurance. *Id.* at 96.

Most significantly, we concluded that the facts did not show that Red Line had the power to control the manner in which the claimant performed her work. We recognized that the claimant was paid by Princeton based on the trip, not on the hours worked for Red Line, which tended to show that Princeton was the employer. We also placed weight on the fact that Princeton retained the right to fire or transfer the claimant and that claimant could refuse to transport a load for Red Line. *Id.* In sum, we concluded that the only action Red Line took with regard to the claimant was to have her take a driver's examination, provide her with a medical certificate, and tell her where to make deliveries. We also considered the fact that the language of the lease indicated that the parties intended for the claimant to remain an employee of

19

Princeton and determined that, although "we are not bound by the nomenclature of the parties applied to their relationship, . . . the other terms of the agreement and the admitted facts establish[ed] that the parties correctly designated their relationship." *Id.* Thus, because Red Line did not have the right to control the claimant's work or the manner of performing it, we held that the claimant had remained an employee of Princeton. *Id.* at 97.

We conclude the instant case is more similar to *JFC Temps, Inc.* than *Red Line Express Co.* Turning to the facts, here, Claimant testified that he first came in contact with East Coast online, that he filled out a paper application at East Coast's office, and that he was hired at East Coast's office. (F.F. No. 35b-c; R.R. at 217a-18a.) After Claimant was hired by East Coast, he was assigned to R&L, did most of his driving for R&L and, in fact, could not recall driving for another company. (F.F. No. 35d-f; R.R. at 218a-19a.) As part of the hiring process with East Coast, Claimant had to demonstrate that he had a valid CDL and met Department of Transportation requirements, and underwent safety training with East Coast, which involved answering East Coast's questions and taking a random drug test. (F.F. No. 35f; R.R. at 219a-20a.) When East Coast assigned Claimant to work for R&L, he was told that he would "operate the way [R&L] [does] things." (F.F. No. 35d; R.R. at 221a.)

Claimant stated that he received a text message from East Coast every Friday informing him that he needed to report to R&L the following week. (F.F. No. 35d; R.R. at 222a.) Claimant also went to East Coast's office every Friday to pick up his weekly paycheck. *Id.* If Claimant needed to take vacation time, call in sick, or had general problems on the job, he contacted East Coast; however, if a similar problem arose during the week he also notified R&L. (F.F. No. 35d-f, 35jj; R.R. at 177a, 222a-23a.) When Claimant was injured, he first reported the injury to R&L, who told him that East Coast would take care of it, after which he reported the injury to East Coast. (F.F. No. 35g-h; R.R. at 224a-25a.)

20

Claimant testified that he considered R&L to be his employer, and that East Coast merely told him where to report and for whom he was working on a given day. (F.F. No. 35r; R.R. at 235a.) Claimant stated that he was required to follow R&L's procedures, and that when he was first assigned to R&L, he was instructed by R&L to complete a "pre-trip and post-trip [inspections] of the equipment at all times." (F.F. No. 35t; R.R. at 239a.) All of the equipment that Claimant used, including the truck and keys, were owned by R&L. *Id.* While Claimant did not wear any type of uniform, the trucks and trailers he drove all said R&L. *Id.* Further, when Claimant delivered to customers, the bills said R&L on them. *Id.*

Additionally, Claimant communicated with R&L's dispatcher, completed R&L's logbook, and received his assignments from R&L's dispatcher. (F.F. No. 35u; R.R. at 240a.) Specifically, Claimant received his assignments from R&L's dispatcher in R&L's breakroom. *Id.* The R&L dispatcher handed Claimant the paperwork for the deliveries, told Claimant the type of truck he would be driving, provided Claimant a manifest of all his stops and pickups, and ran a "bill through the scanner" so that R&L would know where he was located. (F.F. Nos. 35v, 35ii; R.R. at 175a, 240a.) Claimant stated that these conversations always took place at R&L's facility in New Jersey, that he reported to R&L's facility every day, and that he did not have any say in the assignments he received from R&L. (F.F. No. 35v; R.R. at 241a.) If Claimant had an issue with his equipment he notified R&L's mechanics about it. (F.F. No. 35ii; R.R. at 176a.) At the end of each week, Claimant informed R&L's dispatcher that he was done for the week and the dispatcher would tell Claimant he was needed the following week. (F.F. No. 35ii; R.R. at 177a.) If R&L was unhappy with Claimant's performance, it could refuse to allow him to continue working at its facilities. (F.F. No. 35v; R.R. at 241a-42a.)

Claimant further indicated that he had over 20 years of experience, must recertify his license every 4 years and, "as an employee of R&L," made deliveries for

21

it. (F.F. No. 35aa, R.R. at 244a.) Claimant stated he was paid by the hour by East Coast, never received training from East Coast, and although East Coast finds drivers for companies, it does not make any deliveries itself. (F.F. No. 35bb-cc; R.R. at 244a-46a.) Claimant testified that he never received a paycheck from R&L and that East Coast could have assigned him to work for a different company. (R.R. at 247a.)

Additionally, the Agreement between R&L and East Coast stated that East Coast would furnish drivers for R&L, who would be "employees of [East Coast], to operate motor vehicles owned or leased by [R&L] and used in the conduct of [R&L's] business." (F.F. No. 36a; R.R. at 278a.) The Agreement provided that East Coast intended to be responsible for WC claims of its employees, but that the customer was responsible for all other liabilities resulting from drivers' acts. (F.F. No. 36a; R.R. at 278a.) East Coast also represented that it would maintain WC coverage for drivers assigned to R&L, and would indemnify R&L to the extent it failed to satisfy its responsibilities related to WC coverage. (F.F. No. 36b; R.R. at 278a.) Finally, the Agreement provided that "[d]rivers on assignments shall be *borrowed servants* of [R&L] and will be *under the sole control and supervision* of [R&L]." (F.F. No. 36c; R.R. at 279a) (emphasis added).

Like *JFC Temps, Inc.*, in the instant case, Claimant reported daily to his assigned company, R&L, received instructions from R&L regarding the truck to use and where to go for deliveries, received his delivery assignments and paperwork from R&L, and drove R&L's trucks. Moreover, similar to *JFC Temps, Inc.*, R&L could refuse to allow Claimant to continue working if it was unsatisfied with his performance, and directed Claimant's daily activities. In addition, as in *JFC Temps, Inc.*, where our Supreme Court concluded the claimant was a borrowed employer despite the original employer selecting the claimant and the claimant calling the original employer if he was late or ill, here, East Coast originally hired Claimant and

22

Claimant reported to East Coast if he was sick or had problems. However, unlike *JFC Temps Inc.*, Claimant also reported any issues arising during the week to R&L.

Overall, like in *JFC Temps, Inc.*, we conclude that because R&L had the right to control the performance of Claimant's work, it was the borrowing employer. Once Claimant was placed with R&L, he did not receive instructions regarding day-to-day operations from East Coast and received all directions regarding his deliveries, routes, assignments, and trucks from R&L. Indeed other than Claimant receiving a weekly paycheck and text message instructing him to report back to R&L the following week, Claimant had no significant contact with East Coast after being assigned to R&L.

R&L argues that the Board misapplied *Red Line Express Co.* in reaching its decision; however, that case is clearly distinguishable from the instant case. R&L contends that the Board ignored the language in the Agreement stating that East Coast was responsible for WC coverage and that Claimant was an employee of East Coast. Yet, as we determined in *Red Line Express Co.*, while such language is an important factor, it is not dispositive, and the determining factor is the "actual conduct of the parties" and whether R&L "had the power to control Claimant's work and manner of performance." *Red Line Express Co.*, 588 A.2d at 94, 96. Further, unlike *Red Line Express Co.*, the Agreement, here, expressly stated that Claimant was a *borrowed servant* and would be under the *sole control and supervision* of R&L, which tends to negate any contrary weight that might be placed on East Coast's agreement to provide WC coverage.

Additionally, there was R&L insignia on the trucks and trailers driven by Claimant, and contrariwise to *Red Line Express Co.*, there is no evidence of limiting language stating that the trucks and trailers were *leased* to R&L. *See id.* Thus, the presence of R&L's logo on the truck creates a rebuttable presumption that Claimant

23

was R&L's borrowed employee. *See id.* at 95; *Shreiner Trucking Company*, 509 A.2d at 1340.

More importantly, unlike *Red Line Express Co.*, where the evidence demonstrated that Red Line did not have the power to control the manner of the claimant's work, and merely provided the claimant's driver examination and told her where to make deliveries, here, R&L was the entity possessing the right to control the manner of performance of Claimant's work. *JFC Temps, Inc.*, 680 A.2d at 864. Specifically, contrary to *Red Line Express Co.*, after East Coast selected Claimant, verified his qualifications, and placed him with R&L, East Coast's only real involvement with Claimant was to pay his wages, and R&L otherwise controlled all aspects of Claimant's work performance. As discussed previously, R&L owned the trucks driven by Claimant, provided him daily assignments and paperwork, told him what deliveries to make, required him to report to its facility once per day and to update R&L when he was done for the week, and could refuse to allow Claimant to continue working for it if it was unsatisfied with his performance. Additionally, contrasting *Red Line Express Co.*, where Princeton was a trucking company that paid the claimant based on the trip, rather than hours worked, and Princeton periodically checked up on the claimant to find out where she was and instructed her on the routes to take, here, Claimant was paid by the hour and East Coast was not a trucking company, but rather, was merely a conduit that matched drivers with trucking companies. Therefore, the instant case is distinguishable from *Red Line Express Co.* and the Board did not err in concluding that Claimant was R&L's borrowed employee.[11]

---

[11] Finally, R&L argues that the WCJ and Board ignored critical pieces of evidence in reaching their conclusion. However, as noted above, the WCJ accurately recounted Claimant's testimony regarding his relationships with East Coast and R&L, as well as a summary of the Agreement. *See* F.F. Nos. 35-37. The WCJ found Claimant's testimony credible, but placed **(Footnote continued on next page…)**

## Conclusion

Accordingly, because the Board did not err in concluding that Claimant was R&L's borrowed employer, we affirm the order of the Board.

_____
PATRICIA A. McCULLOUGH, Judge

---

**(continued…)**

greater weight on Claimant's testimony that he reported to R&L on a daily basis; received work assignments regarding when and where to go from R&L's dispatcher; drove R&L's trucks and trailers; and R&L could refuse to continue Claimant's assignments. (F.F. No. 40.) The WCJ also found that this testimony was supported by the language in the Agreement stating that Claimant was the borrowed servant of R&L and was under the sole control and supervision of R&L. *Id.* Based on this evidence, the WCJ found that Claimant was R&L's borrowed employee.

"[I]t is a fundamental tenet of workers' compensation law that the WCJ, as fact-finder, has complete authority over questions of witness credibility and evidentiary weight." *Verizon Pennsylvania Inc. v. Workers' Compensation Appeal Board (Mills)*, 116 A.3d 1157, 1162 (Pa. Cmwlth. 2015). Therefore, "[a]s the ultimate fact-finder, the WCJ has exclusive province over questions of credibility and evidentiary weight, and is free to accept or reject the testimony of any witness . . . in whole or in part." *Id.* Here, the WCJ credited Claimant's testimony, but placed greater weight on the evidence demonstrating that R&L controlled the manner of performance of Claimant's work. It is apparent that R&L's argument regarding the evidence that the WCJ allegedly disregarded is merely an attempt to have us reweigh the evidentiary determinations made by the WCJ. Because such determinations are within the exclusive province of the fact-finder, they are not subject to review on appeal.

In any event, because the WCJ examined the entirety of both Claimant's testimony and the Agreement, and determined both were credible, we fail to discern how the WCJ ignored evidence. We also conclude that the WCJ's legal determination that Claimant was R&L's borrowed employer, which is fully reviewable on appeal, *see Red Line Express Co.*, 588 A.2d at 93, was correct.

## IN THE COMMONWEALTH COURT OF PENNSYLVANIA

R&L Carriers,                           :
              Petitioner          :
                              :   No. 1164 C.D. 2019
              v.                  :
                              :
Workers' Compensation  Appeal          :
Board (Timothy Grace, East Coast       :
Driver Solutions, QBE Insurance        :
Company and Uninsured Employers         :
Guaranty Fund),                         :
              Respondents          :

## *ORDER*

AND NOW, this 12th day of June, 2020, the July 24, 2019 order of the Workers' Compensation Appeal Board is affirmed.

 

_____
PATRICIA A. McCULLOUGH, Judge